IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 17, 2017

**JEWELL WAYNE SMITH, JR. v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Robertson County**
**No. 2011-CR-690      William R. Goodman III, Judge**

---

**No. M2017-00538-CCA-R3-PC**

---

The Petitioner, Jewell Wayne Smith, Jr., appeals from the Robertson County Circuit Court's denial of his petition for post-conviction relief from his 2013 best interest guilty plea to voluntary manslaughter, for which he is serving a thirteen-year sentence. The Petitioner contends that (1) his guilty plea was involuntary and (2) he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Joe R. Johnson II, Springfield, Tennessee, for the appellant, Jewell Wayne Smith, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; John W. Carney, District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the Petitioner's April 1, 2013 best interest guilty plea to voluntary manslaughter. *See North Carolina v. Alford*, 400 U.S. 25 (1970). Pursuant to the plea agreement, the Petitioner was sentenced as a Range III offender, with the length of the sentence to be determined by the trial court. The court sentenced the Defendant to thirteen years' incarceration and ordered consecutive service with an unrelated sentence.

**Guilty Plea Proceedings**

At the guilty plea hearing, the State's recitation of the facts was as follows:

The facts would show . . . the victim and the defendant had once been friends, but had developed a disagreement over some money and the night of the homicide that occurred on Blair Street, about 2005 Blair, about an hour or so before that homicide . . . the defendant pulled up in a green, I believe a Pontiac and got out and then probably thirty minutes or so, twenty minutes or so before the homicide, and Martel (phonetic) Black would say [that he] and the defendant and . . . Terrence Bigby, were in a car smoking marijuana when . . . the victim came by on his bicycle and bumped the car[.] [Martel Black would say] that [the victim] went on down the street. The [d]efendant got out of the car and had a weapon in his hand, he would describe it as a Smith and Wesson, .40 caliber and that [the defendant] made some comments about the victim and . . . Mr. Black would say that he called the victim multiple times to warn [the victim] about [the defendant] and this is corroborated by phone records[.]

The proof would show that the victim . . . went to April Davis' house to see, to sit for phone calls and finally picked up on[ ]the last one and after talking, left to head back down the street to 2005 Blair. Ms. Davis will say that when [the victim] came in, he took a gun out and put it on the dresser drawers and when he left, he picked that gun back up[.]

[Corroborating witnesses] would then say . . . that the victim came down on his bicycle, got off his bicycle at 2005 Blair, it's a housing authority duplex. There's a tree there and . . . a couple of witnesses would say at that time that [the defendant] was . . . behind the tree, kind of in a dark area and that the victim got [off his bicycle] and [witnesses] could tell a conversation occurred and that shortly thereafter, a ray [sic] of gunfire, describe[d] anywhere between four to six . . . [and one witness] told me seven[,] shots. Everybody described the gunfire going in one direction from the defendant to the victim. Nobody [saw] any gunfire coming back the other way and describes the victim is shot multiple times and from there—does not die immediately . . . gets up and goes down the street and waves for help. At that time, the [d]efendant, Mr. Smith, flees the scene.

At a trial, [the witnesses] we have . . . served, we've done a lot of going out and knocking on doors and getting people served and there's a couple of people not served that were hiding from us. We have several . . . [witnesses] . . . say they saw the gunfire, but say they didn't see [the defendant] actually do the shooting. One witness in [Tennessee Department of Correction] has . . . an aggravated conviction . . . that would be the only eyeball witness that we would have. [The defendant] gave a

statement . . . that if he testified, would say that the victim, he did shoot one time but that was only because the victim pulled the gun on him first. Would have a witness say that he did—the police weren't sure where the crime scene occurred so it took them—because the victim had fled down the street, by the time they got up to the crime scene, most everything had been picked up. Out of all six shots, no shell casings—only one bullet found. No guns found. Would have one witness to say that he did pick up a gun, may or may not be the victim's gun[.] So there is not a lot of physical evidence at the scene because the crime scene had been cleared or cleaned up before the police realized where the crime scene was. That would be the facts . . . to show—we do have an eyeball witness that would say the [d]efendant shot him [and] [o]ther witnesses that would corroborate that. Due to the circumstances of witnesses' impeachment and not sure exactly what everyone is going to say on the stand—we even had one [witness] at the [preliminary hearing] to [change] her story, feel that this is the best interest of the State to take this settlement.

At the guilty plea hearing, the trial court reviewed the plea agreement with the Petitioner, including the offense to which he was pleading guilty and the possible sentence he could receive. The Petitioner told the court that he understood the agreement and that he understood he was pleading guilty as a Range III offender even though he qualified as a Range II offender. The court informed the Petitioner of his rights to a jury trial, to confront witnesses, to present witnesses in his defense, and to appeal a finding of guilt. When asked if the Petitioner waived those rights, he answered, "Yes." The court asked the Petitioner whether he thought it was "in his best interest to enter this plea," and he responded "Yes sir." The Petitioner said that he did not have any questions for the court.

The Petitioner was sentenced to thirteen years' incarceration. He appealed his sentence, and this court denied relief. *See State v. Jewell Wayne Smith, Jr.*, No. M2013-01573-CCA-R3-CD, 2014 WL 683965 (Tenn. Crim. App. Feb. 20, 2014), *perm. app. denied* (Tenn. May 14, 2014). The Petitioner filed a post-conviction petition, alleging that his guilty plea was involuntarily entered and that he received the ineffective assistance of counsel.

**Post-Conviction Proceedings**

At the post-conviction hearing, the Petitioner testified that he was indicted for first degree murder, that counsel was appointed to represent him, and that he pleaded guilty to voluntary manslaughter. The Petitioner said he told counsel that the altercation with the victim occurred because the Petitioner knew the victim was involved in a murder and that the Petitioner acted in self-defense.

The Petitioner testified that counsel met with him three times but that counsel did not respond to his letters. The Petitioner said he filed a complaint with the Board of Professional Responsibility.

The Petitioner testified that he met with counsel once before a court hearing and once before the trial date to discuss the State's plea offer. The Petitioner stated that counsel told him that counsel was unprepared for trial, that the Petitioner faced a fifty-one-year sentence if convicted of first degree murder, and that the Petitioner should accept the offer. The Petitioner said that they never discussed a self-defense theory and that he was coerced into accepting the offer because counsel was unprepared.

The Petitioner testified that he did not meet with counsel to prepare for the sentencing hearing and that counsel did not prepare witnesses for the hearing. The Petitioner said that counsel did not file an appeal, that he filed his appeal pro se, and that appellate counsel was later appointed. The Petitioner stated that appellate counsel appealed only the sentence and that the appeal was denied. The Petitioner said that facts supported his self-defense claim, that he told appellate counsel those facts, and that appellate counsel said it was a post-conviction issue.

On cross-examination, the Petitioner testified that he and the victim had an altercation about the victim's involvement in a murder. The Petitioner stated that he had witness statements and limited ballistic evidence. The Petitioner said that he "pretty much" knew the evidence the State would present if his case went to trial.

The Petitioner testified that he pleaded guilty as a Range III offender but that he was classified as a Range II offender. The Petitioner admitted that during the plea colloquy, he said he understood he was pleading out of range but that he was "under duress, at the time because [he] wanted to go to trial . . . and didn't know what to do." The Petitioner stated that he knew he would be sentenced at the court's discretion and that he was on probation when the current offense occurred.

The Petitioner testified that he gave counsel the names of individuals to call as witnesses at the sentencing hearing and that counsel subpoenaed those individuals. The Petitioner stated that he decided to testify at the hearing, that he recalled counsel asking him why he pleaded guilty, and that he recalled answering "because the case, it . . . [has] too many ups and downs . . . it can go both ways." The Petitioner did not recall saying at the hearing he had concerns about witnesses appearing in court but recalled his concerns about the lack of ballistic evidence.

The Petitioner testified that he understood a best interest guilty plea to mean "it was in [his] best interests to take the State's plea agreement or go [to court] with an unprepared lawyer." The Petitioner stated that counsel did not explain the risks of

pleading guilty and that he was not in the "right state of mind" because he did not know what to do.

Counsel testified that he had been practicing law since 2004, that in the past he worked as an assistant district attorney general, and that he had tried two or three homicide cases. Counsel said that he now worked as a criminal defense attorney and that 95% of his cases were criminal.

Counsel testified that he provided discovery, telephone records, and ballistic evidence to the Petitioner. Counsel stated that he investigated the crime scene. Counsel stated that he summarized transcripts from the preliminary hearing and the discovery materials into a document for cross-examination purposes. Counsel said he spent about 150 hours working on the Petitioner's case. Counsel testified that one bullet was recovered from the crime scene and that it was shot from a .40-caliber gun. Counsel stated that the Petitioner gave the police a .45-caliber gun, that a witness saw the Petitioner with two guns the night of the shooting, and that one was a .40-caliber gun.

Counsel testified that he met with the Petitioner for more than an hour explaining the physical evidence and eyewitness testimony the State would present at trial. Counsel stated that he and the Petitioner discussed a self-defense theory but that no physical evidence corroborated the theory. Counsel said he told the Petitioner that three witnesses saw the Petitioner under the tree during the shooting and heard gunshots.

Counsel testified that he discussed the State's plea offer with the Petitioner and that they discussed "the pros and cons" of the case. Counsel stated that he told the Petitioner it was his decision to go to trial but "that under the circumstances, given the amount of risks . . . [counsel] thought it was a fair offer[.]" Counsel said that he explained the offer required the Petitioner to plead guilty to voluntary manslaughter as a Range III offender. Counsel stated that the Petitioner accepted the offer and that he reviewed the plea form twice with the Petitioner. Counsel said that he discussed the plea colloquy with the Petitioner and that he asked the Petitioner if he understood. Counsel stated that he did not recall the Petitioner's having concerns about entering the plea and that the Petitioner "didn't get upset about the plea deal until after sentencing." Counsel testified that he prepared for the sentencing hearing and that he subpoenaed the appropriate witnesses. Counsel stated he advised the Petitioner that he could receive consecutive sentencing with an unrelated sentence he was serving.

On cross-examination, counsel testified that he met with the Petitioner about five times. Counsel stated that after the initial meeting, the Petitioner wrote a letter and had a family member call counsel's office. Counsel stated that he did not discuss the Petitioner's case with his family members because of the attorney-client privilege. Counsel said that he met with the Petitioner after the Petitioner wrote multiple letters to the Board of Professional Responsibility, that he explained why he would not speak with

the Petitioner's family, and that he would respond to the Petitioner's letters if given time. Counsel stated that he was prepared for a trial and that he would have asked for a continuance if he were unprepared.

Counsel testified that the Petitioner did not sign the plea agreement until the morning of the hearing and that he answered the Petitioner's questions about the agreement. Counsel said that he enjoyed working with the Petitioner and that the Petitioner received a "good outcome under the circumstances." Counsel said he did not coerce the Petitioner into pleading guilty.

Appellate counsel testified that he was appointed to represent the Petitioner, after the Petitioner had filed a notice of appeal. Appellate counsel said that sentencing was the only issue raised in the notice and that he did not raise an issue requesting review for plain error.

After receiving the proof, the post-conviction court denied relief. The court determined that counsel adequately communicated with the Petitioner and that the Petitioner's ineffective assistance of counsel claim was without merit. Based on the findings, the court implicitly credited counsel's testimony. The court found that counsel reviewed the facts and applicable law with the Petitioner and consulted with the Petitioner numerous times regarding the State's plea offer. The court determined that the Petitioner voluntarily and knowingly pleaded guilty. This appeal followed.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

## I.      Involuntary Guilty Plea

The Petitioner contends that his guilty plea was coerced because counsel was unprepared for a trial and that the Petitioner's guilty plea was involuntary. The State responds that the Petitioner failed to show that counsel coerced the Petitioner into pleading guilty. We agree with the State.

The Supreme Court has concluded that a guilty plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant."

*Alford*, 400 U.S. at 31. A trial court must examine in detail "the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969); *see Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). Appellate courts examine the totality of circumstances when determining whether a guilty plea was voluntarily and knowingly entered. *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). A guilty plea is not voluntary if it is the result of "[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." *Boykin*, 395 U.S. at 242-43; *see Blankenship*, 858 S.W.2d at 904. A petitioner's representations and statements under oath that his guilty plea is knowing and voluntary create "a formidable barrier in any subsequent collateral proceedings [because] [s]olemn declarations . . . carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

The record reflects that the Petitioner entered a knowing, intelligent, and voluntary best interest guilty plea. Counsel's credited testimony reflects that he discussed the plea agreement and the State's evidence with the Petitioner. Counsel reviewed the plea form twice with the Petitioner before he entered his plea. The guilty plea hearing transcript reflects that the Petitioner told the trial court he understood he was waiving certain rights by pleading guilty and that he did not have any questions about his plea. The Petitioner, upon questioning, did not express concern at the plea hearing about counsel's competence, nor did he inform the court that he felt coerced into pleading guilty. The Petitioner said he understood that the court would determine the length of the sentence and that he would be sentenced as a Range III offender. The court asked the Petitioner whether it was in his best interest to plead guilty, and the Petitioner responded "Yes sir." The Petitioner testified at the sentencing hearing that he pleaded guilty because his case has "too many ups and downs" and that it could "go both ways." Likewise, counsel testified at the post-conviction hearing that he told the Petitioner that the Petitioner's sentence might be imposed consecutively with the sentence the Petitioner was currently serving in incarceration. We conclude the record does not preponderate against the post-conviction court's findings that the Petitioner entered a knowing, intelligent, and voluntary guilty plea. The Petitioner failed to prove he is entitled to relief on this basis.

## II. Ineffective Assistance of Counsel

The Petitioner contends that he received the ineffective assistance of counsel, arguing that counsel was not adequately prepared for a trial or the sentencing hearing. The State responds that the Petitioner failed to prove that counsel provided deficient representation. We agree with the State.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687

(1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Counsel's credited testimony at the post-conviction hearing reflects that he was prepared for a trial. Counsel investigated the crime scene, reviewed discovery, and summarized witness statements. Counsel said that he worked about 150 hours on the Petitioner's case and that he provided the Petitioner with the discovery and the ballistic evidence. Counsel met numerous times with the Petitioner to review the evidence and to discuss the State's plea offer. Counsel said he answered the Petitioner's questions regarding the plea offer, that he subpoenaed witnesses for the sentencing hearing, and that he was prepared for the sentencing hearing. We agree with the post-conviction court's determinations that counsel's representation was not deficient. The Petitioner failed to establish his ineffective assistance of counsel claim and is not entitled to relief on this basis.

The judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-8-